AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

FILED ___ ENTERED
LODGED ___ RECEIVED

**MAY 24 2019**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. MJ 19-225
One (1) Target Vehicle and Four (4) Target )
Telephones, more fully described in Attachment A )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

One (1) Target Vehicle and Four (4) Target Telephones, more fully described in Attachment A, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g), 924(c) | Felon in possession of a firearm; possession of a firearm in furtherance of drug trafficking; |
| 21 U.S.C. §§ 846, 841, 844 | conspiracy, attempt to possess a controlled substance with intent to distribute, possession |

The application is based on these facts:

✓ See Affidavit of Andriy Vavilin, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☐ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Andriy Vavilin, Special Agent
*Printed name and title*

◉ The foregoing affidavit was sworn to before me and signed in my presence, or
○ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: May 24, 2019

_____
*Judge's signature*

City and state:  Seattle, Washington

Michelle L. Peterson, United States Magistrate Judge
*Printed name and title*

1
## AFFIDAVIT OF SPECIAL AGENT ANDRIY VAVILIN

2  STATE OF WASHINGTON            )

3                                )        ss

4  COUNTY OF KING                 )

5

6  I, Andriy Vavilin, a Special Agent ("SA") with the Bureau of Alcohol, Tobacco,

7  Firearms, and Explosives ("ATF"), having been duly sworn, state as follows:

8
## AFFIANT BACKGROUND

9       1.      I, Andriy I. Vavilin, being duly sworn, depose and state, that I am a Special

10 Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), United

11 States Department of Justice, and have been so employed since July of 2017.  I am a law

12 enforcement officer of the United States, and am empowered by law to conduct

13 investigations of, and to make arrests for, offenses against the United States, as codified

14 at Title 18, United States Code, Section 3051.  I have completed the Federal Law

15 Enforcement Training Center Criminal Investigative Program and the ATF National

16 Academy Special Agent Basic Training Program in Brunswick, Georgia.  Prior to

17 becoming an ATF Special Agent, I graduated from Rowan University and received a

18 Bachelor's of Arts Degree in Law & Justice (Summa Cum Laude).  From 2014 to 2017, I

19 was employed as a Police Officer with the United States Capitol Police.

20      2.      During my professional training and experience, I have both assisted in and

21 conducted investigations into firearms and narcotic violations.  I have also participated in

22 undercover operations, and in the execution of search warrants at locations associated

23 with these individuals.  During the execution of search warrants, I have participated in the

24 recovery of evidence related to firearms and narcotic violations.  Through this experience

25 and training, and based upon the experience of other Special Agents which have been

26 relayed to me, I have become familiar with the modus operandi of narcotic dealers and

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 1

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  narcotic traffickers and illegal possessors of firearms and ammunition as enumerated

2  herein.

### INTRODUCTION AND PURPOSE OF AFFIDAVIT

4     3.     This Affidavit is submitted in support of a request for authorization to

5  search the following TARGET VEHICLE and TARGET TELEPHONES, which are

6  more particularly described in Attachment A to this Affidavit, attached hereto and

7  incorporated by this reference as if set forth fully herein:

8     **TARGET VEHICLE:** a beige colored Ford Edge WA, license plate number

9     DP59503 (registered to Sonya Foote, 21720 44th Avenue Ct. E, Spanaway, WA,

10    per Washington Department of Licensing).  This vehicle is specifically described

11    in Paragraphs 25-28, 39-44.

12    **TARGET TELEPHONE 1** is a cellular telephone, carrying telephone number

13    (702) 328-8722, which was plugged into the TARGET VEHICLE center console

14    area and was located on the driver's side floorboard of the TARGET VEHICLE.

15    This phone is specifically described in Paragraph 47.

16    **TARGET TELEPHONE 2** is an iPhone 6S cellular telephone in a "Pie Flippa"

17    case, which fell out of the TARGET VEHICLE when Robert Ruiz PEREZ exited.

18    This phone is specifically described in Paragraphs 48, 51.

19    **TARGET TELEPHONE 3** is an iPhone 6S cellular telephone in a "Pie Flippa"

20    case, which fell out of the TARGET VEHICLE when Robert Ruiz PEREZ exited.

21    This phone is specifically described in Paragraphs 48, 51.

22    **TARGET TELEPHONE 4** is a cellular telephone inside a black Incipio phone

23    case, which was located on top of the back center console of the TARGET

24    VEHICLE.  This phone is specifically described in Paragraph 49.

25    4.     The Affidavit seeks to search the TARGET TELEPHONES and TARGET

26  VEHICLE for the items described in Attachment B to this Affidavit.

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 2
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5.      On May 22, 2019, agents arrested Princeton Brown in MJ18-5081 based on a criminal complaint for two counts of Felon in Possession of a Firearm, in violation of 18 U.S.C. 922(g)(1), 924(a)(2), and 2.  That same day, agents arrested Robert Ruiz Perez in MJ 19-223 based on a criminal complaint for one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. 922(g)(1), 924(a)(2), and 2.

6.      As set forth below, there is probable cause to believe that a search of the TARGET TELEPHONES and TARGET VEHICLE will recover evidence of violations of Title 18, United States Code, Section 922(g) – Felon in Possession of a Firearm; Title 18, United States Code, Section 924(c) – Possession of a Firearm in Furtherance of Drug Trafficking; Title 21, United States Code, Section 846 – Conspiracy to Possess with Intent to Distribute a Controlled Substance; Title 21, United States Code, Section 841(a)(1) – Attempted Possession of a Controlled Substance with Intent to Distribute; and Title 21, United States Code, Section 844 – Possession of a Controlled Substance.

7.      I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from oral and written reports of other law enforcement officers participating in this and related investigations, and from records, documents and other evidence obtained during this investigation.  Since this affidavit is being submitted for the limited purpose of obtaining the relief sought herein, I have not included every fact known concerning this investigation.  I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested warrant.

## SUMMARY OF PROBABLE CAUSE

8.      On or about April 8, 2019, ATF Las Vegas initiated an investigation of Daniel Terrell Nathan, who was engaging in drug trafficking activity in Las Vegas, Nevada.  ATF undercover Special Agent Zayas ("UC Zayas"), with an ATF Confidential Informant (hereinafter "CI"), met with Nathan on numerous occasions.  Nathan was attempting to obtain Fentanyl for an associate.  During these conversations, UC Zayas

AFFIDAVIT OF ANDRIY VAVILIN - 3
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and CI questioned Nathan as to whether he had a firearm source and explained that the

2   firearms purchased would be sent to Mexico. Nathan referred them to Princeton

3   BROWN, a.k.a "Treal."

4       9.     For the last year, CI has provided information and assistance to ATF for

5   monetary compensation. CI is not currently on probation or parole. CI has multiple prior

6   convictions for drug distribution (federal and state), drug possession, burglary, theft,

7   assault, resisting arrest, and firing a weapon. CI also previously worked as an ATF

8   informant, pursuant to a cooperation agreement. However, s/he was arrested and

9   convicted for drug distribution while under that prior agreement.

10       10.    During the last year, CI has provided information already known to

11   investigators as well as information unknown at the time, but later corroborated through

12   independent investigations and/or investigations by outside agencies. CI has not

13   provided any information investigators have found to be false or unreliable, either in his

14   prior work with ATF or during his current work with ATF. CI has demonstrated a

15   working street knowledge of narcotics, prices, appearance and trafficking habits,

16   particularly with regard to high-level drug transactions ranging anywhere from $5,000 to

17   $60,000 as well as multi-state drug trafficking practices. To date, CI has conducted

18   and/or participated in numerous controlled purchases and/or buy bust operations

19   involving stolen firearms, cocaine, methamphetamine and heroin.

20       11.    In April 2019, CI made several recorded calls with BROWN and Nathan.

21   During those calls, which Agents reviewed, BROWN discussed possession of rifles and

22   handguns for sale.

23       12.    Specifically, on April 26, 2019, CI received a call from Nathan at (702)

24   762-1757. Nathan initiated a three-way call with an individual who identified himself as

25   "Treal." CI told "Treal" that the CI needed a list of the guns, a price and "Treal's" phone

26   number so that the CI's associate in Seattle could contact him. "Treal" stated that he was

27   heading back to Las Vegas, NV. "Treal" said that the "FN" rifles he had previously

28

AFFIDAVIT OF ANDRIY VAVILIN - 4

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 offered were not available, but he had the handguns. "Treal" requested that the CI send

2 him $4,000. The CI informed "Treal" that he would not send the money. "Treal" stated

3 that he was about to get on an airplane and would not purchase the guns. "Treal" stated

4 that he lived both in down there and up here. The CI told "Treal" that if he had the guns

5 up there, the CI could have an associate meet him. "Treal" provided his phone number,

6 (702) 328-8722, and spelled out his name as "Treal." The CI stated that the CI would

7 call his associate and have him call "Treal." Unbeknownst to "Treal," the associate, was

8 ATF undercover Special Agent Hunt ("UC Hunt"). A publicly available databases search

9 of the phone number provided by "Treal," (702) 328-8722, returned as being associated

10 to Princeton BROWN.

11      13.     On or about April 29, 2019, UC Zayas and the CI met with Nathan and

12 BROWN in Las Vegas to discuss potential firearms deals. BROWN explained that he

13 had the ability to provide firearms but the firearms would be sourced through BROWN's

14 connections in Tacoma. BROWN advised he had individuals who "run up inside there"

15 to steal firearms being offered for sale. BROWN advised, "I got a lot that I keep for

16 myself." BROWN questioned the CI and UC Zayas as to whether they wished to

17 purchase "MACs." BROWN displayed a photograph of a MAC-11 firearm on his

18 cellular telephone. NATHAN stated that the firearm being offered for sale did not have a

19 suppressor, as depicted on the photograph. BROWN advised that he was seeking five

20 hundred and fifty dollars ($550.00) for the firearm. At the conclusion of the meeting,

21 BROWN walked away from the table.

22      14.     On April 30, 2019, CI received a photograph via cellular telephone, (702)

23 328-8722, of an FNH, 9mm caliber pistol with a loaded magazine. CI in return contacted

24 BROWN via cellular telephone, (702) 328-8722. BROWN asked CI if he/she had

25 Whatsapp on his/her cellular telephone. CI responded that he/she did not. BROWN

26 stated, "I'm about to go pick this up right now, I'm about to send you something." CI

27 questioned BROWN about what time his/her associate, UC Hunt, should call BROWN

28

AFFIDAVIT OF ANDRIY VAVILIN - 5
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the following day.  BROWN requested in the afternoon.  BROWN asked CI if he had
2  some "work" out there (in Las Vegas).  I know "work" to be street vernacular for
3  narcotics.  CI responded in the affirmative.

4       15.    Through recorded phone calls and text messages, CI put BROWN into
5  direct contact with UC Hunt.  UC Hunt explained to BROWN over the phone that he had
6  received CI and UC Zayas' money and that he would pick up the firearms whenever
7  BROWN was ready.

8       16.    During the morning of May 2, 2019, UC Hunt and BROWN exchanged text
9  massages regarding their deal.  At approximately 1345 hours, UC Hunt spoke to
10  BROWN on the phone letting him know that he would be in Tacoma soon.  BROWN
11  told UC Hunt that he wanted to meet at 56th and Pacific Avenue in Tacoma, to which UC
12  Hunt agreed. UC Hunt drove to the predetermined location and parked at the Walgreens
13  at that intersection.  At approximately 1422 hours, surveillance units around the location
14  observed BROWN driving a black Cadillac CTS, bearing WA license plate number
15  BLT8847 (registered to Qiana Marie Simmons, 3534 S L St, Tacoma, WA, per
16  Washington Department of Licensing).  BROWN called UC Hunt and told him he did not
17  want to conduct the deal in that parking lot.  BROWN told UC Hunt to follow him to his
18  jewelry shop.

19       17.    Surveillance watched BROWN exit the parking lot in his vehicle onto 56th
20  Street and turn north on Pacific Avenue, with UC Hunt following him. BROWN turned
21  into a small parking lot between two pawn shops and in front of a building marked only
22  with the address, 5410 Pacific Avenue (Tacoma, WA).

23       18.    UC Hunt parked his vehicle next to BROWN's and got out.  BROWN got
24  out of his vehicle and walked to his trunk.  UC Hunt could see the handle of a black pistol
25  sticking out of BROWN's pocket.  Upon UC Hunt's noticing the pistol, UC Hunt and
26  BROWN both laughed and shook hands.  BROWN then opened his trunk and pulled out

27
28

AFFIDAVIT OF ANDRIY VAVILIN - 6

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  a black plastic pistol box and a yellow microfiber towel.  The two then got into UC

2  Hunt's vehicle.

3      19.     Inside UC Hunt's vehicle, BROWN opened the pistol box, revealing the

4  two FNH pistols listed above with loaded magazines and ammunition scattered about the

5  box.  UC Hunt told BROWN that he thought they were going to do a deal for 10 guns.

6  BROWN explained, in sum, that it would only be for the two.  UC Hunt asked BROWN

7  how much he wanted for them and BROWN stated $2,500.00.  UC Hunt told BROWN

8  that the price was too high and that he didn't want to overpay with someone else's

9  money.  BROWN told UC Hunt, in sum, that CI and UC Zayas knew and told him to call

10  them.  UC Hunt then called CI in front of BROWN on the speaker function of his phone.

11  BROWN stated that he wanted $2,500.00 and CI agreed.

12      20.     After hanging up the phone, BROWN explained to UC Hunt, in sum, that

13  he normally would secure the firearms with zip-ties.  UC Hunt asked BROWN why and

14  BROWN explained, "Because I don't want you to shoot me.  Shit this is real business

15  bro."  BROWN wiped down the firearm with the microfiber towel and told UC Hunt to

16  take a picture of the guns in the box on his lap and send it to him so that he could send it

17  to CI so that CI could see what he got.  BROWN then explained, "Nah, so the only

18  reason he ain't getting the other ones is because my little buddy just got popped."

19  BROWN had previously mentioned to UC Hunt during a phone call that his friend had

20  just been shot and UC Hunt asked how he was.  BROWN explained "Nah I guess they

21  went and socked somebody up and he didn't do anything, but the dude didn't know who

22  shot him so he decided to shoot everybody."  UC Hunt took a picture of the guns and

23  texted it to both BROWN and to CI and asked BROWN if he got these all the time and

24  BROWN told him, "I just have my little homies go get them.  You know what I'm

25  saying?  We rock and roll.  In a couple days, there'll be a whole bunch more.  It's just

26  that, right now, we just gotta hold off for a couple of seconds."  UC Hunt understood this

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 7

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  to mean that BROWN and his people needed the guns for any immediate altercations

2  stemming from the shooting.

3      21.     UC Hunt then paid BROWN $2,500.00 in twenties and hundreds.

4  BROWN counted out the money and swiped the hundreds with a counterfeit pen that UC

5  Hunt provided him.  BROWN told UC Hunt that "the other ones are going to be big, like

6  ARs and Ks," referring to AR-15 and AK-47 variant assault rifles, for their next deal.

7  BROWN then exited UC Hunt's vehicle.  Surveillance units observed BROWN shut the

8  door to UC Hunt's vehicle and wipe down the door handle with a yellow microfiber

9  towel.  UC Hunt, through the window, handed BROWN the car keys that he left in UC

10  Hunt's vehicle and then UC Hunt departed the scene concluding the deal.  Surveillance

11  units attempted to follow BROWN in his vehicle but lost him several movements after

12  due to BROWN's fast driving and quick lane changes.  Based on my training and

13  experience, it appeared as if BROWN was conducting counter surveillance.

14      22.     Following the undercover operation, SA David Cline checked whether the

15  firearms were stolen.  Both were.  The above referenced FNH, 9mm caliber pistol, serial

16  number 61BMN05102 was reported stolen (reference Nisqually Tribal PD case

17  #190000092).  The FNH, 9mm caliber pistol, serial number GKU0001103 was also

18  reported stolen (reference Tacoma Police Department case # 1903201413).

19      23.     On May 3, 2019, UC Zayas and CI met with Nathan in Las Vegas, Nevada.

20  CI explained to Nathan that UC Zayas was traveling to Mexico and would be returning

21  with ten (10) to fifteen (15) kilograms of cocaine.  CI explained the purity of the cocaine

22  and that they would offer a good price.  UC Zayas, through CI, also explained that after

23  the next firearms transaction, they would all meet to discuss the cocaine sale.  UC Zayas,

24  through CI, questioned Nathan as to whether BROWN was capable of conducting such a

25  cocaine transaction.  Nathan responded "uh, yeah, most definitely, he get that sh*t in one

26  day."

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 8

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      24.     On May 7, 2019, BROWN texted UC Hunt a picture of a Ruger, 9mm

2    pistol and asked him if they wanted it.  CI and BROWN had multiple recorded

3    conversations that day regarding several other firearms that BROWN told him/her that he

4    could obtain from other sources.  During the evening of May 7, 2019, at approximately

5    1900 hours, UC Hunt called BROWN and told him he was on his way to meet him.

6    BROWN told UC Hunt, in sum, that he didn't need to bring a lot of money because he

7    wasn't able to obtain some of the firearms he had spoken to CI about.  The two agreed to

8    meet around 2000 hours at BROWN's jewelry shop at 5410 Pacific Avenue, Tacoma,

9    WA, the same location as the previous deal.  Additionally, BROWN told UC Hunt that he

10   would further inquire about several "pump" shotguns before he and UC Hunt met.

11   Shortly after, BROWN texted UC Hunt "750," meaning that the deal was only for the

12   Ruger pistol for $750.00.

13      25.     At approximately 2014 hours, UC Hunt drove into the parking lot at 5410

14   Pacific Ave in Tacoma, WA.  UC Hunt parked his vehicle up against the building on the

15   North side of the lot.  Surveillance units observed the TARGET VEHICLE, a beige

16   colored Ford Edge WA, license plate number DP59503 (registered to Sonya Foote, 21720

17   44th Avenue Ct. E, Spanaway, WA, per Washington Department of Licensing).  Agents

18   identified BROWN as the driver.  BROWN had his driver's side window down and

19   parked immediately next to UC Hunt, who also had his driver's side window down.

20   BROWN handed UC Hunt a gun case through the windows.  UC Hunt opened the case,

21   inspected the Ruger pistol, and handed BROWN $760.00 cash.

22      26.     UC Hunt got out of the vehicle and began to talk to BROWN through

23   BROWN's window.  BROWN told UC Hunt about an individual who had a fully

24   automatic, Russian made, shotgun and showed UC Hunt text messages haggling back and

25   forth for BROWN to purchase the firearm from him.  In BROWN's cellular phone, UC

26   Hunt observed that the individual was named Hustle and Grind (or a variation of those

27   words, with possibly a different spelling).  BROWN apologized for bringing UC Hunt all

28

AFFIDAVIT OF ANDRIY VAVILIN - 9

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the way to Tacoma for just one gun and showed UC Hunt several other texts
2  demonstrating that he had been hustling all day.  BROWN said he didn't want to rush
3  people because that put undue pressure on them and made them nervous.

4        27.     UC Hunt asked BROWN if he owned the shop behind his vehicle and
5  BROWN told him that it was his jewelry shop.  BROWN invited UC Hunt to see it and
6  got out of his vehicle and walked with UC Hunt to the back door.  UC Hunt met several
7  individuals working at the shop as they walked in.  Inside, the shop was empty, in
8  preparation to be opened, street murals were painted on the walls, lighting was being
9  installed, and tarps were on the floors.  BROWN took UC Hunt to the front of the shop
10  and showed him where the jewel cases would go once it opened.  UC Hunt asked him
11  when he would open and BROWN told UC Hunt, in sum, whenever they finished.  UC
12  Hunt noticed on the window a sign with the words "Trax NW."

13        28.     After seeing the shop, UC Hunt and BROWN walked back outside.
14  BROWN had told UC Hunt that he was leaving for Las Vegas the following morning and
15  UC Hunt told him he would probably see BROWN there.  BROWN asked UC Hunt if he
16  would be available later if he came across more firearms that BROWN could sell UC
17  HUNT before he left.  UC Hunt told BROWN that he would. UC Hunt concluded the
18  deal with BROWN, returned to his vehicle, and drove away.  Surveillance units followed
19  BROWN to a 7-Eleven convenience store a short distance away.  Once at the location,
20  BROWN got out of his vehicle and stepped in and out of the store, looking around the
21  area prior to getting back into the vehicle.  BROWN then drove back to the jewelry store.
22  Similar to May 2, 2019, and again based on my training and experience, it appeared that
23  BROWN was conducting counter surveillance.

24        29.     UC Hunt kept in touch with BROWN via text message that night, finally
25  hearing from BROWN that he wouldn't be able to get anything else before leaving for
26  Las Vegas.

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 10
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.     Following the operation, ATF Special Agent Andriy Vavilin checked whether the firearm was stolen.  The above referenced Ruger, 9mm caliber pistol, serial number 860-96193, was reported stolen (reference Federal Way Police Department case # 190005493).

31.     On May 14, 2019, UC Hunt and UC Zayas, along with CI, met with BROWN in Las Vegas, Nevada, for the purpose of discussing BROWN's cocaine business and to potentially set up a multi-kilogram deal with BROWN.  The meeting was recorded.  As described below, BROWN openly discussed his drug business, to include cocaine and marijuana sales.  BROWN showed UC Hunt and CI pictures on his cellular phone of him with stacks of money and a marijuana grow in his home, which he described as not being large enough to meet his supply needs.  BROWN explained, in sum, that he was part of an organization which he called the "PF Gang," and showed pictures of custom jewelry and clothing.  "Pie Flippa" was printed on some of the jewelry BROWN showed UC Hunt, and BROWN explained that that "PF" stands for "Pie Flippa."  A review of BROWN's social media accounts displayed multiple other instances of jewelry with either "PF" or "Pie Flippa."

32.     Posing as narcotic suppliers connected with Mexican drug traffickers that could traffic large kilogram drug shipments through Nogales and Phoenix to Las Vegas, UC Zayas, using CI as an interpreter, quoted BROWN a price of $25,000.00 per kilogram of cocaine.  BROWN told CI, in sum, that the price was better than anyone else's at the moment and told the group that he and his people were currently paying $31,000.00 per kilogram of cocaine.  CI said that his associates give guns to UC Zayas' Mexican Cartel connections and that helps them secure the drug routes.  BROWN told the group, in sum that he needed the cocaine in Tacoma, because that's where he and his associates sold it. CI then offered UC Hunt's services, to transport the cocaine from Las Vegas to Tacoma for a fee.  The group briefly discussed options on how that would be done and told BROWN that he could track the shipment, hop in with the load or put someone else in

AFFIDAVIT OF ANDRIY VAVILIN - 11

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    with UC Hunt as he drove it to Tacoma.  UC Zayas told BROWN that he wanted to start

2    with a deal for 1-3 kilograms.  BROWN told the group that his associates usually don't

3    step out of their established supply.  BROWN told the group that they recently had a deal

4    for two kilograms but that one of the kilograms was bad and the group took a loss.

5    BROWN told CI and the agents he wouldn't be able to unilaterally agree to starting

6    business with them and called one of his associates in Tacoma.  The individual didn't

7    answer and BROWN told them, in sum, that he would get back to them with an answer.

8         33.    CI then asked BROWN if they could "invest" in his jewelry shop, alluding

9    to laundering drug proceeds through it.  BROWN told the group that it was a possibility

10   and showed them pictures of the shop and its inventory on his cellular telephone.

11   BROWN told the agents and CI that his organization also dealt with money orders, and

12   that associates of theirs would come through on a regular basis with money orders for

13   $30,000.00.  Based on my training and experience, I understand BROWN to be using

14   these money orders to clean his drug proceeds.

15        34.    UC Zayas and BROWN tentatively agreed to a starting deal for one

16   kilogram of cocaine.  BROWN said he would get back to them with a full commitment

17   after he spoke with his associates.  The party concluded the deal and the agents and CI

18   departed from BROWN.

19        35.    On May 17, 2019, CI contacted BROWN via cellular telephone, (702) 328-

20   8722.  Among other conversation, BROWN questioned CI if he could grab "half (1/2) of

21   that, real fast"?  Based on my training and experience, in addition to the prior

22   conversations between CI and BROWN, I understood "half" to refer to a half kilogram of

23   cocaine.  CI responded that he/she was going to call his/her cousin, UC Zayas, who was

24   returning to Las Vegas later this week.  CI offered to sell BROWN half a kilogram and

25   provide him another half a kilogram, with payment at a later date.  CI advised that he/she

26   would call BROWN upon S/A Zayas' return.  BROWN questioned CI if he/she was still

27   interested in purchasing firearms.  CI responded in the affirmative.

28

AFFIDAVIT OF ANDRIY VAVILIN - 12

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    36.    On May 20, 2019, CI received two text photographs from cellular number,
2    (702) 328-8722.  One of the photographs depicted an "AR" type rifle. The second
3    photograph depicted a Desert Eagle pistol with a loaded magazine.  On the same date, CI
4    contacted BROWN via cellular telephone, (702) 328-8722.  BROWN questioned CI if
5    he/she received his pictures, to which CI replied to in affirmative.  BROWN advised the
6    CI he would send an additional picture with his hand on it.  CI advised BROWN that UC
7    Hunt will have three to four kilograms of cocaine in Washington on Wednesday, May 22,
8    2019, so BROWN does not need to travel to Las Vegas.  BROWN questioned if he could
9    buy a sample, so he could sell it.  CI reassured BROWN that he would receive a half
10   (1/2) a kilogram on May 22, and UC Hunt would provide him another half (1/2) a
11   kilogram, with payment for the second half at a later date.  CI stated he/she would have
12   UC Hunt contact BROWN.  At one point, Brown offered to the CI to make payment for
13   the cocaine in part by providing three firearms.  Brown sent pictures of the guns he
14   intended to trade.

15   37.    On May 21, 2019, BROWN called the CI in a recorded call and asked to
16   buy four kilograms of cocaine and said he could "move them."  CI agreed to sell
17   BROWN the four kilograms of cocaine, to be delivered by UC Hunt on CI's behalf.
18   Brown told CI, and later UC Hunt, that he would not have the cash for the cocaine until
19   later that day, but that he would provide the equivalent of $100,000 of jewelry from Trax
20   Northwest.  Brown explained that, in speaking with his "partner," his partner agreed to let
21   Brown take the jewelry to UC Hunt to use as collateral until they were able to return to
22   UC Hunt with cash.

23   38.    On the same date, Brown called UC Hunt.  Brown and UC Hunt agreed to
24   meet the following date, May 22, 2019, in Kent, WA to make the exchange.  UC Hunt
25   asked if Brown could meet around 1 p.m.  Brown said "I'll make it happen."  On May 22,
26   2019, UC Hunt called Brown and told him he was at the Hawthorne Suites, located at
27   6329 S 212th Street, Kent, WA.  Brown asked for UC Hunt to send him the address for
28

AFFIDAVIT OF ANDRIY VAVILIN - 13
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   the location for the meet.  Brown and UC Hunt exchanged multiple telephone

2   communications prior to the meet, pushing the time back, and discussing trust and good

3   business.

4       39.    Prior to the meet, law enforcement conducted surveillance in the early

5   evening hours at 5410 Pacific Avenue, Tacoma, WA, the Trax Northwest jewelry shop

6   where BROWN previously sold guns to ATF.  During surveillance, an officer saw a

7   person he recognized as PEREZ take what appeared to be a multicolored bag to the

8   passenger side of the TARGET VEHICLE.  PEREZ got into the front passenger seat of

9   the Ford Edge.  A short while later, the Ford Edge drove away.  The bag was consistent

10  with the black and white polka dot bag later recovered from the Ford Edge.

11      40.    At approximately 1820 hours, Brown and occupants arrived in the same

12  beige Ford Edge and parked on the south east side of the Hawthorne Suites.  Brown

13  called UC Hunt and asked him if he was upstairs or downstairs.  Once the vehicle came

14  to a stop, the arrest was initiated.  ATF Special Agents Austin Wozniak and Catherine

15  Cole were participating in the arrest operation with Special Agent Brent Price and Brian

16  Arnold.  Agent Wozniak and Agent Cole approached the passenger side of Brown's

17  vehicle.  Agents observed the vehicle was occupied by three individuals- the driver,

18  Brown, the front passenger (later identified as PEREZ) and a rear driver's side passenger

19  side (later identified as Daniel Peluso).

20      41.    All the personnel on the arrest were wearing law enforcement markings

21  clearly identifying themselves as police, and announced themselves as "Police" as they

22  approached the vehicle.  The front passenger, PEREZ, and the other individuals in the

23  vehicle repeatedly disregarded the arresting agent's instructions to put their hands up.

24  The vehicle had very dark tint, but agents observed PEREZ to be placing his hands into

25  his lap area and then appear to toss items on the floor.  Agent Wozniak observed PEREZ

26  to repeatedly look back toward law enforcement and make furtive gestures towards the

27  floor area of the front passenger compartment.  Based on Agent Wozniak's training and

28

AFFIDAVIT OF ANDRIY VAVILIN - 14

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    experience, and my own, he is aware that suspects facing imminent arrest frequently

2    attempt to create separation between their persons and incriminating evidence.  PEREZ's

3    actions were consistent with an individual dumping evidence onto the floor board of the

4    vehicle.

5           42.     PEREZ then opened the passenger door and was again repeatedly told to

6    put his hands up.  PEREZ did put his hands up, but also stepped out of the vehicle toward

7    the arresting agents.  Agent Cole immediately took hold of PEREZ and guided him to the

8    ground.

9           43.     Agent Wozniak conducted a visual frisk of the front passenger seat area

10   where PEREZ placed his hands during his furtive gestures.  Agent Wozniak observed

11   several items in plain view- a large quantity of cash (which appeared to be thousands of

12   dollars) on the front passenger floorboard of the vehicle, strewn about; a black bag or

13   case; a black and white polka dot bag; and a blue, purple, and white thin bag open at one

14   end.  Inside the black and white polka dot bag, officers observed small boxes with the

15   label Trax Northwest, consistent with jewelry boxes.  Through the opening of the blue,

16   purple, and white thin bag, which was the bag closest to PEREZ and directly at his feet,

17   Agent Wozniak observed the base plate of a magazine inserted into a firearm.

18   Photographs subsequently taken of the firearm revealed the marking "SW" at the bottom

19   of the grip of the firearm (visible through the opening in the bag), next to the magazine

20   well.  Based on my training and experience, I recognize the "SW" logo to be for the

21   Smith & Wesson company.

22          44.     In between the driver's seat (where BROWN was sitting) and center

23   console, agents observed another firearm, which appeared to be the grip and magazine of

24   a Glock pistol.  This gun is consistent with one of the photographs BROWN sent the CI

25   depicting a gun he could bring to the deal.

26          45.     Based on Agent Wozniak's training and experience, and my own, cash

27   intended to be utilized for the purchase of a large quantity of cocaine and a firearm would

28

AFFIDAVIT OF ANDRIY VAVILIN - 15

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  be items a suspect would attempt to remove from his person when confronted by law

2  enforcement, and disposing of these items would be consistent with the observations of

3  PEREZ's gestures noted by Agent Wozniak and Cole as they approached PEREZ.

4       46.     Agent's Price, Arnold, Eric Jackson, and Angelo Salcepuedes took

5  BROWN and PEREZ into custody.  BROWN was arrested pursuant to the

6  aforementioned Tacoma warrant issued in MJ 19-5081.

7       47.     On the driver's side floorboard of the TARGET VEHICLE, agents located

8  TARGET TELEPHONE 1, which was plugged into the TARGET VEHICLE center

9  console area.  On scene, agents called (702) 328-8722, the number UC Hunt had used to

10  communicate with BROWN, and TARGET TELEPHONE 1 rang.  A search incident to

11  arrest of BROWN revealed $207, several hundred pills which appeared to be Ecstasy, a

12  small quantity of marijuana, and multiple diamond jewelry pieces in a jewelry bag in his

13  pocket.

14       48.     During a search incident to arrest of PEREZ, agents located $1,010.25,

15  mostly in $20.00 bills, in his pocket.  When PEREZ exited the TARGET VEHICLE, two

16  iPhone 6S cellular telephones fell out, both in Pie Flippa cases (TARGET

17  TELEPHONES 2 and 3).

18       49.     The rear driver's side passenger, Peluso, was frisked for weapons.  During

19  the frisk, an agent felt what appeared to be baggies of drugs.  Agents read Peluso his

20  Miranda rights.  Peluso then said that he had a hundred dollars' worth of cocaine on his

21  person.  Peluso denied knowledge of the cocaine deal with UC Hunt.  Agents seized the

22  cocaine from Peluso's pocket, and it field-tested positive for cocaine.

23       50.     TARGET TELEPHONE 4 is a cellular telephone inside a black Incipio

24  phone case, which was located on top of the back center console of the TARGET

25  VEHICLE.  The phone is next to, and possibly connected to a backpack on the back rear

26  right side of the vehicle.  Peluso claimed this phone was his phone.

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 16

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

51.     All of the TARGET TELEPHONES were placed in a Faraday bag to secure
their contents of the telephones.  The TARGET TELEPHONES are currently in ATF
custody.

52.     TFO Steffes read PEREZ his Miranda rights, which he understood.  In
subsequent interviews, PEREZ stated he came with Princeton Brown, a.k.a "Treal," to
bring jewelry.  PEREZ stated he sells jewelry and Brown is his friend and customer.
PEREZ said he had been working with Brown on a "jewelry transaction" for two days.
He admitted that one of the bags at his feet contained three to four appraisals as well as
pendants inside the Trax Northwest boxes.  PEREZ said the jewelry he brought was
worth $25,000.00.  PEREZ admitted that he dropped cash from his lap as arresting
officers approached.  He said some of the cash was from a transaction that had just
occurred.  When asked about the above referenced firearm, PEREZ stated there probably
was a gun, but it wasn't his.  PEREZ stated his fingerprints or DNA would not be
recovered from the firearm.  Additionally, PEREZ made an unsolicited statement to TFO
Steffes stating he doesn't know if the firearm had "any bodies on it."  PEREZ said that
the two iPhone 6S cellular telephones (TARGET TELEPHONES 2 and 3) were his
phones.

53.     During transport to his initial appearance, BROWN said to agents that they
had pulled a hundred Ecstasy pills out of his pocket.

54.     Based on my training and experience, I know that individuals engaging in
drug trafficking commonly bring firearms to drug purchases, in order to protect
themselves, their cash, and the drugs.  This is particularly true when dealing with the
aforementioned quantity of cocaine, for which Brown agreed to pay $100,000.00.

**Nexus on Firearms**

55.     ATF Special Agent David Cline examined the two FNH pistols and Ruger,
9mm pistol purchased from BROWN.  SA Cline also examined the Smith and Wesson
pistol recovered on May 22, 2019.  Based on SA Cline's knowledge and experience as a

AFFIDAVIT OF ANDRIY VAVILIN - 17
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    certified Interstate Nexus Expert, he determined that the above-referenced guns are

2    "firearms" as defined by federal law, and that none of them were manufactured in the

3    State of Washington.  As a result, each of the firearms must have traveled in, and thereby

4    affected, interstate or foreign commerce, in order to be received or possessed in the State

5    of Washington.

6                                       **Criminal Histories**

7         56.    I have reviewed BROWN's criminal history and observed he has multiple

8    felony convictions punishable by imprisonment for a term exceeding one year, each of

9    which would federally prohibit him from possessing firearms.  His prior convictions

10   include:

11              *Attempted Residential Burglary*, under cause number 01-1-02546-7, in

12              Pierce County Superior Court, on or about July 2, 2001;

13              *Unlawful Possession of a Firearm in the Second Degree*, under cause

14              number 06-1-01936-1, in Pierce County Superior Court, on or about August

15              10, 2006;

16              *Unlawful Possession of a Firearm in the Second Degree*, under cause

17              number 11-1-02627-4, in Pierce County Superior Court, on or about

18              October 17, 2011;

19              *Attempted Burglary in the Second Degree*, under cause number 11-9-

20              02676-8, in Kitsap County Superior Court, on or about December 22, 2011.

21        57.    I have reviewed PEREZ's criminal history and observed he has multiple

22   felony convictions punishable by imprisonment for a term exceeding one year, each of

23   which would federally prohibit him from possessing firearms.  His prior convictions

24   include:

25              *Unlawful Possession of a Controlled Substance with Intent to Deliver*

26              *(Cocaine),* under cause number 01-1-06057-2, in Pierce County Superior

27              Court, on or about April 18, 2002; and

28

AFFIDAVIT OF ANDRIY VAVILIN - 18
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    *Possession with Intent to Distribute Cocaine*, under case number CR 93-

2    2667, in the U.S. District Court for the Western District of Washington, on

3    or about April 29, 1994.

**Common Characteristics of Drug Traffickers**

4

5    58.    As a result of my training and experience, and based on my consultation

6    with other agents and law enforcement officers, I have an understanding of the manner in

7    which narcotics are distributed and the various roles played by individuals and groups in

8    their distribution. I have encountered and have become familiar with various tools,

9    methods, trends, paraphernalia, and related articles utilized by various traffickers in their

10   efforts to import, conceal, and distribute controlled substances. I am also familiar with the

11   manner in which drug traffickers use telephones, often cellular telephones, to conduct

12   their unlawful operations. I am also familiar with the manner in which drug traffickers

13   will use weapons to protect their drug activities and further its goals.

14   59.    Based upon my training, experience, and conversations with other

15   experienced officers and agents, I know that:

16           a.    Drug trafficking conspiracies usually take place over several months

17   or years, and continue to operate even when enforcement activity results in arrests and/or

18   seizures of drugs and/or money.

19           b.    Persons involved in the distribution of controlled substances

20   typically will obtain and distribute drugs on a regular basis, much as a distributor of a

21   legal commodity would purchase stock for sale. Similarly, such drug dealers will

22   maintain an "inventory," which will fluctuate in size depending upon the demand for and

23   the available supply of the product.

24           c.    It is common for drug dealers to possess narcotics, drug

25   paraphernalia, and other items which are associated with the sale and use of controlled

26   substances such as scales, containers, cutting agents/substances, and packaging materials

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 19

USAO # 2019R00459

1 in their residences, stash houses, storage units, garages, outbuildings and/or vehicles on
2 their property.

3        d.     Drug traffickers often document aspects of their criminal conduct
4 through photographs or videos of themselves, their associates, their property, and their
5 product. Drug traffickers usually maintain these photographs or videos in their
6 possession.

7        e.     It is a common practice for drug traffickers to maintain records
8 relating to their drug trafficking activities in their residences, stash houses, storage units,
9 garages, outbuildings and/or vehicles. Because drug traffickers in many instances will
10 "front" (i.e., sell on consignment) controlled substances to their clients, or alternatively,
11 will be "fronted" these items from their suppliers, such record keeping is necessary to
12 keep track of amounts paid and owed, and such records will also be maintained close at
13 hand so as to readily ascertain current balances. These records include "pay and owe"
14 records to show balances due for drugs sold in the past (pay) and for payments expected
15 (owe) as to the trafficker's suppliers and distributors, telephone and address listings of
16 clients and suppliers, and records of drug proceeds. These records are commonly kept for
17 an extended period of time.

18        f.     Drug traffickers maintain books, records, receipts, notes, ledgers,
19 airline tickets, money orders, and other papers relating to the transportation and
20 distribution of controlled substances. These documents, whether in physical or electronic
21 form, are maintained where the traffickers have ready access to them. These documents
22 include travel records, receipts, airline tickets, auto rental agreements, invoices, and other
23 memorandum disclosing acquisition of assets and personal or business expenses. I also
24 know that such records are frequently maintained in narcotics traffickers' residences,
25 stash houses, storage units, garages, outbuildings and/or vehicles.

26        g.     Drug traffickers often maintain large amounts of US currency in
27 order to maintain and finance their ongoing illegal drug trafficking business.

28

AFFIDAVIT OF ANDRIY VAVILIN - 20
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        h.     It is common for drug dealers to secret drugs, currency and other

2 valuable items representing the proceeds of drug sales in secure locations within their

3 residences, stash houses, storage units, garages, outbuildings and/or vehicles on the

4 property in order to prevent the theft of such items by other persons or the seizure of such

5 items by law enforcement. These secure locations typically include other residences also

6 known as "stash houses," storage lockers, safes, portable safes, vaults, or other locked

7 containers (sometimes requiring passwords or codes to open), as well as specially

8 constructed concealed compartments such as those often found in "load cars" used

9 specifically to facilitate drug trafficking.

10        i.     It is common to find papers, letters, billings, documents, and other

11 writings, which show ownership, dominion, and control of businesses, residences, and/or

12 vehicles in the residences, stash houses, storage units, garages, outbuildings and/or

13 vehicles of drug traffickers. Items of personal property that tend to identify the person(s)

14 in residence, occupancy, control, or ownership of the premises also include canceled

15 mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries,

16 utility and telephone bills, statements, identification documents, keys, financial papers,

17 rental receipts and property ownership papers, personal and business telephone and

18 address books and telephone toll records, and other personal papers or identification

19 cards in the names of subjects involved in the criminal activity being investigated.

20        j.     Drug traffickers commonly have in their possession, that is, on their

21 person, at their residences, stash houses, storage units, garages, outbuildings and/or

22 vehicles, firearms, ammunition, and other weapons, which are used to protect and secure

23 their property. Persons who purchase and possess firearms also tend to maintain the

24 firearms and ammunition for lengthy periods of time. Firearms can be acquired both

25 legally and unlawfully, without official / traceable documentation. Persons who acquire

26 firearms from Federal Firearms Licensees, through deliberated fraud and concealment,

27 often will also acquire firearms from private parties and other sources unknown to ATF.

28

AFFIDAVIT OF ANDRIY VAVILIN - 21
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Firearms or ammunition are often secreted at other locations within their residential

2  curtilage, and the identification of these firearms will assist in establishing their origins.

3  Persons who purchase, possess, sell and/or trade firearms or ammunition commonly

4  maintain documents and items that are related to the purchase, ownership, possession,

5  sale and/or transfer of firearms, ammunition, and/or firearm parts, including but not

6  limited to driver's licenses, telephone records, telephone bills, address and telephone

7  books, canceled checks, receipts, bank records and other financial documentation on the

8  owner's person, at the owner's residence, or in vehicles that they own, use, or have

9  access to.

10         k.    Drug traffickers use mobile electronic devices including cellular

11  telephones and other wireless communication devices in connection with their illegal

12  activities in order to set up meetings with coconspirators, conduct drug transactions, or to

13  arrange for the transportation drugs or drug proceeds. As described below, such

14  equipment often contains evidence of these illegal activities.

15         l.    Traffickers of controlled substances commonly maintain addresses,

16  vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or

17  telephone numbers of their suppliers, customers, and associates in the trafficking

18  organization, and it is common to find drug traffickers keeping records of said associates

19  in cellular telephones and other electronic devices. Traffickers often maintain cellular

20  telephones for ready access to their clientele and to maintain their ongoing narcotics

21  business. Traffickers frequently change their cellular telephone numbers to avoid

22  detection by law enforcement, and it is common for traffickers to use more than one

23  cellular telephone at any one time.

24             **Evidence Frequently Found on Phones**

25      60.    Based upon my training and experience, and conversations with, and

26  training from, other officers and agents involved in narcotics investigations, I know that

27  drug dealers use cellular telephones as a tool or instrumentality in committing their

28

AFFIDAVIT OF ANDRIY VAVILIN - 22
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  criminal activity.  They use them to maintain contact with their suppliers, distributors,

2  and customers.  They prefer cellular telephones because, first, they can be purchased

3  without the location and personal information that land lines require.  Second, they can be

4  easily carried to permit the user maximum flexibility in meeting associates, avoiding

5  police surveillance, and traveling to obtain or distribute drugs.  Third, they can be passed

6  between members of a drug conspiracy to allow substitution when one member leaves the

7  area temporarily.  Many of the drug dealers I have contacted have used one or more

8  cellular telephones for his or her drug business.  I also know that it is common for drug

9  traffickers to retain in their possession phones that they previously used, but have

10  discontinued actively using, for their drug trafficking business.  The cellular telephones

11  are used to call, text, or otherwise communicate with suppliers and customers of illegal

12  drugs. As a result, evidence of drug dealing can often be found in text messages, call

13  logs, photographs, videos, and other stored data on the cellular phone.

14        61.        Based on my training and experience in investigating numerous firearms

15  possession and trafficking offenses, I am aware that when individuals who are prohibited

16  from legally possessing firearms seek to acquire firearms, they typically seek to obtain

17  the firearms from private sellers.  A common way in which these types of private firearm

18  sales, also referred to as "street sales," are transacted is via electronic communications

19  such as text message, email, and/or telephone calls.  I know that cell phones are

20  frequently used to arrange such transactions because of the flexibility and mobility they

21  offer.  I am further aware that when individuals are offering items of value for sale, such

22  as firearms, it is common for them to take a photograph of the item and send it via text

23  message or email to an interested party for their review, or to take a photograph of it to

24  post/advertise it via social media or the internet.  During numerous investigations of

25  firearms sales, I have found it to be common for buyer's or seller's cell phones to contain

26  photographs of the firearms that were bought or sold.

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 23
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

62.     Based on the investigation of BROWN and PEREZ, as summarized above, it is clear that they illegally possessed firearms.  Based on my review of BROWN and PEREZ's criminal history, I know that they would be unable to lawfully purchase a firearm at a Federal Firearms Licensee (FFL) because they would not be able to honestly answer certain disqualifying questions on ATF paperwork and because they would not pass a mandatory background check.  Because they would not be able to obtain firearms lawfully, it is likely that BROWN and PEREZ obtained the firearms by purchasing them in private or street sales.  Therefore, for the reasons outlined immediately above, I believe it is likely that the TARGET DEVICES will contain evidence of BROWN and PEREZ unlawfully purchasing and possessing firearms.

63.     Based on my training and experience, the data maintained in a cellular telephone may include evidence of a crime or crimes.  This includes the following:

a.     The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone.  This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package.

b.     The stored list of recent received, missed, and sent calls is important evidence.  It identifies telephones recently in contact with the telephone user.  This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts.  This information is valuable in the firearms context because it will identify telephones used by other individuals who are part of

AFFIDAVIT OF ANDRIY VAVILIN - 24
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   illegal firearms transactions, and confirm the date and time of contacts.  Further, the

2   information is helpful (and thus is evidence) because it leads to friends and associates of

3   the user who can identify the user, help locate the user, and provide information about the

4   user.  Identifying a defendant's law-abiding friends is often just as useful as identifying

5   his drug-trafficking associates.

6          c.      Stored text messages are important evidence, similar to stored

7   numbers.  Agents can identify both drug associates, customers, and friends of the user

8   who likely have helpful information about the user, his location, and his activities.

9          d.      Photographs on a cellular telephone are evidence because they help

10  identify the user, either through his or her own picture, or through pictures of friends,

11  family, and associates that can identify the user.  As noted above, it is also likely that

12  photographs of contraband firearms, firearms accessories, and/or ammunition are on the

13  subject phone.  Pictures also identify associates likely to be members of the drug

14  trafficking organization.  Some drug dealers photograph groups of associates, sometimes

15  posing with weapons and showing identifiable gang signs.  It is also likely that

16  photographs of contraband firearms, firearm accessories, and/or ammunition are on the

17  subject phone.  Also, digital photos often have embedded "geocode" or GPS information

18  embedded in them.  Geocode information is typically the longitude and latitude where the

19  photo was taken.  Showing where the photo was taken can have evidentiary value.  This

20  location information is helpful because, for example, it can show where coconspirators

21  meet, where they travel, and where assets might be located.

22         e.      Stored address records are important evidence because they show the

23  user's close associates and family members, and they contain names and nicknames

24  connected to phone numbers that can be used to identify suspects.

25      64.     Based upon the evidence provided, it is reasonable to believe the TARGET

26  TELEPHONES were utilized to further drug trafficking by communications between UC

27  Hunt, CI, BROWN and his associates.  It is also reasonable to believe the TARGET

28

AFFIDAVIT OF ANDRIY VAVILIN - 25
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  TELEPHONES were utilized by BROWN and PEREZ to obtain firearms that they could

2  not lawfully possess. Because of the manner in which the devices were used it is

3  reasonable to believe the TARGET TELEPHONES were used as instrumentalities of the

4  crimes under investigation.

5       65.    Moreover, because the TARGET TELEPHONES were located in close

6  proximity to some of the recovered firearms, the aforementioned data that establishes the

7  user of the TARGET TELEPHONES is relevant to establish possession of the firearms in

8  question.

9                          **TECHNICAL TERMS**

10       66.    Based on my training and experience, I use the following technical terms to

11  convey the following meanings:

12            a.    Wireless telephone: A wireless telephone (or mobile telephone, or

13  cellular telephone) is a handheld wireless device used for voice and data communication

14  through radio signals. These telephones send signals through networks of

15  transmitter/receivers, enabling communication with other wireless telephones or

16  traditional "land line" telephones. A wireless telephone usually contains a "call log,"

17  which records the telephone number, date, and time of calls made to and from the phone.

18  In addition to enabling voice communications, wireless telephones offer a broad range of

19  capabilities. These capabilities include: storing names and phone numbers in electronic

20  "address books;" sending, receiving, and storing text messages and e-mail; taking,

21  sending, receiving, and storing still photographs and moving video; storing and playing

22  back audio files; storing dates, appointments, and other information on personal

23  calendars; and accessing and downloading information from the Internet. Wireless

24  telephones may also include global positioning system ("GPS") technology for

25  determining the location of the device.

26

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 26

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

67.     Based on my knowledge, training, and experience, I know that cellular telephones, can store information for long periods of time.  This information can sometimes be recovered with forensic tools.

68.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET TELEPHONES were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the TARGET TELEPHONES because cellular telephones retain call logs, texts, and photographs in the memory of the cellular telephone.  Similar to a computer or other digital device this information is retained in phone until it is written over.

69.     *Manner of execution*.  Because this warrant seeks only permission to examine a vehicle and cellular telephones already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## SEARCH TECHNIQUES

70.     Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or otherwise copying all data contained on the TARGET TELEPHONES, and will specifically authorize a review of the media or information consistent with the warrant.

71.     In accordance with the information in this affidavit, law enforcement personnel will execute the search of the TARGET TELEPHONES pursuant to this warrant as follows:

72.     **Securing the Data.**  In order to examine the TARGET TELEPHONES in a forensically sound manner, law enforcement personnel with appropriate expertise will

AFFIDAVIT OF ANDRIY VAVILIN - 27
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | attempt to produce a complete forensic image, if possible and appropriate, of the
2 | TARGET TELEPHONES.  Law enforcement will only create an image of data
3 | physically present on or within the TARGET TELEPHONES.  Creating an image of the
4 | TARGET TELEPHONES will not result in access to any data physically located
5 | elsewhere.  However, TARGET TELEPHONES that have previously connected to
6 | devices at other locations may contain data from those other locations.

7 | 73.    **Searching the Forensic Images.**  Searching the forensic images for the
8 | items described in Attachment B may require a range of data analysis techniques.  In
9 | some cases, it is possible for agents and analysts to conduct carefully targeted searches
10 | that can locate evidence without requiring a time-consuming manual search through
11 | unrelated materials that may be commingled with criminal evidence.  In other cases,
12 | however, such techniques may not yield the evidence described in the warrant, and law
13 | enforcement may need to conduct more extensive searches to locate evidence that falls
14 | within the scope of the warrant.  The search techniques that will be used will be only
15 | those methodologies, techniques and protocols as may reasonably be expected to find,
16 | identify, segregate and/or duplicate the items authorized to be seized pursuant to
17 | Attachment B to this affidavit.

18 | //
19 | //
20 | //
21 | //
22 | //
23 | //
24 | //
25 | //
26 | //
27 | //
28 |

AFFIDAVIT OF ANDRIY VAVILIN - 28
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## **CONCLUSION**

2  74.  Based on the foregoing, I respectfully submit that probable cause exists to

3 search the TARGET TELEPHONES described in Attachment A, for evidence, fruits, and

4 instrumentalities of the aforementioned offenses, as described in Attachment B.

5

6

7

8            ANDRIY VAVILIN, Affiant
             Special Agent, ATF

9

10  SUBSCRIBED AND SWORN before me this ___24th___ day of May 2019.

11

12

13

14            MICHELLE L. PETERSON
             United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF ANDRIY VAVILIN - 29
USAO # 2019R00459

## ATTACHMENT A

### Property to Be Searched

The following property in ATF custody in King County:

**TARGET VEHICLE:** a beige colored Ford Edge WA, license plate number DP59503 (registered to Sonya Foote, 21720 44th Avenue Ct. E, Spanaway, WA, per Washington Department of Licensing).

**TARGET TELEPHONE 1** is a cellular telephone, carrying telephone number (702) 328-8722, which was plugged into the TARGET VEHICLE center console area and was located on the driver's side floorboard of the TARGET VEHICLE.

**TARGET TELEPHONE 2** is an iPhone 6S cellular telephone in a "Pie Flippa" case, which fell out of the TARGET VEHICLE when Robert Ruiz PEREZ exited.

**TARGET TELEPHONE 3** is an iPhone 6S cellular telephone in a "Pie Flippa" case, which fell out of the TARGET VEHICLE when Robert Ruiz PEREZ exited.

**TARGET TELEPHONE 4** is a cellular telephone inside a black Incipio phone case, which was located on top of the back center console of the TARGET VEHICLE.

AFFIDAVIT OF ANDRIY VAVILIN - 30
USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT B

### Items to be Seized

The items to be seized are the following items or materials that may contain evidence of the commission of, the fruits of, or property which has been used as the means of committing federal criminal violations of Title 18, United States Code, Section 922(g) – Felon in Possession of a Firearm; Title 18, United States Code, Section 924(c) – Possession of a Firearm in Furtherance of Drug Trafficking; Title 21, United States Code, Section 846 – Conspiracy to Possess with Intent to Distribute a Controlled Substance; Title 21, United States Code, Section 841(a)(1) – Attempted Possession of a Controlled Substance with Intent to Distribute; and Title 21, United States Code, Section 844 – Possession of a Controlled Substance:

1.    Any suspected controlled substances, for example, cocaine;

2.    Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin B12, etc.;

3.    Firearms and firearms related items, including magazines, ammunition, holsters, and body armor, or other dangerous weapons;

4.    Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances, or the acquisition and possession of firearms and ammunition;

5.    Items identifying drug customers and drug suppliers, such as, telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, and similar items;

6.    Currency and financial records that show income from, or activity related to, drug trafficking, including bank records, money transfer records, safe

AFFIDAVIT OF ANDRIY VAVILIN - 31

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; and other records that show income and expenditures, net worth including receipts for personal property, negotiable instruments, bank drafts, cashiers checks, and similar items;

7.      Jewelry, appraisals for jewelry, and containers for jewelry;

8.      Photographs, video tapes, digital cameras, and similar items depicting the vehicle occupants, suspected buyers or sellers of controlled substances, firearms, controlled substances, drug distribution paraphernalia, and assets derived from the distribution of controlled substances;

9.      Evidence relating to the purchase, ownership, rental, or control of the vehicle;

10.     Items of personal property that tend to identify the occupancy, control, or ownership of the vehicle, including title for the vehicle, insurance paperwork, mail, lease paperwork for the vehicle, telephone books, identification documents, and keys;

11.     Identification documents, including passports, visas, alien registration cards, any and all travel documents, immigration documents, driver's licenses, identification cards, and social security cards;

12.     Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rent a car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel; and

13.     Cellular telephones and other communications devices including the TARGET TELEPHONES and any other cellular telephones located within the TARGET VEHICLE, including Blackberries, Androids, iPhones, and similar devices. With respect to this item only, investigating agents are

AFFIDAVIT OF ANDRIY VAVILIN - 32

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

authorized to search the TARGET TELEPHONES for the following items, whether deleted or not:

a. Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);
b. Stored list of recent received, sent, and missed calls;
c. Stored contact information;
d. Photographs related to federal criminal violations of the aforementioned offenses, including any embedded data associated with these photographs;
e. Videos related to federal criminal violations of the aforementioned offenses, including any embedded data associated with these videos;
f. Photographs that may show the user of the phone and/or co-conspirators, including any embedded GPS data associated with these photographs;
g. Videos that may show the user of the phone and/or co-conspirators, including any embedded GPS data associated with these photographs;
h. Stored text messages related to federal criminal violations of the aforementioned offenses, including Facebook messages, WhatsApp messages, and other similar messaging services where the data is stored on the telephone; and
i. Stored text messages, emails, and other electronic messages that may show the user of the phone.

AFFIDAVIT OF ANDRIY VAVILIN - 33

USAO # 2019R00459

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970